UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF ALABAMA

In re:                                                    Case No. 10-30392
                                                          Chapter 13
TAMMY R. NOBLES
DAVID E. NOBLES,

      Debtors.


**MEMORANDUM OPINION**

      Currently before the court is Mortgage Corporation of the South's (hereinafter "creditor") motion seeking reconsideration of this court's order overruling its objection to the confirmation of the debtors' plan. At issue is the rate of interest that must be paid on the creditor's claim in order to satisfy the requirements of 11 U.S.C. § 1325(a)(5)(B)(II)(ii) thereby ensuring that the creditor will receive the present value of its claim. More particularly, the parties agree that under the holding in *Till v. SCS Credit Corp.*, 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004), the appropriate cram down interest rate is determined by using the formula approach, which begins with the national prime rate but adjusts the prime rate for risk of nonpayment. What is disputed here is the correct adjustment for the risk of nonpayment.

      Upon consideration of the facts adduced at trial and of the law, the court will grant the creditor's motion to reconsider and set aside the order confirming the plan.

Jurisdiction

      The court's jurisdiction in this dispute is derived from 28 U.S.C. § 1334 and from an order of the United States District Court for this district wherein that court's jurisdiction in title 11 matters was referred to the Bankruptcy Court. *See* General Order of Reference of Bankruptcy Matters (M.D. Ala. Apr. 23, 1985). Further, because a core matter, plan confirmation, is at issue here, this court's jurisdiction is extended to the entry of a final order or judgment pursuant to 28 U.S.C. § 157(b)(2)(L).

Findings of Fact and Procedural History

Debtors filed this chapter 13 case on February 18, 2010. Their proposed plan provides that the creditor's $8,879.09 claim, which is secured by a 2006 Toyota Scion, will be paid in full over the 5-year term of the plan with interest at 4.5%.

Creditor objected to confirmation of the debtors' plan contending that it would not receive the present value of its claim in that the proposed interest rate was too low. Following an evidentiary hearing, the creditor's objection was overruled (Doc. #37). There, the court found that a 1.25 % risk factor adjustment to the 3.25% prime rate offered under the debtors' plan was adequate to provide the creditor with the present value of its claim over time.[1] Thereafter, on May 27, 2010, the creditor filed a timely motion seeking reconsideration of the order overruling its objection to confirmation.

The creditor describes itself as a "sub-prime lender" operating in the Montgomery, Alabama area. It lends to persons who typically would not be able to obtain traditional bank financing. The creditor itself borrows in order to obtain the necessary capital to operate. The creditor pays more in interest to its lenders than it is receiving under the debtors' proposed plan.

John Williams, the creditor's president, testified that the creditor would incur between $300 and $1500 in liquidation expenses if the debtors' plan were to fail. Williams further testified concerning the rate of depreciation of the debtors' vehicle. He contended that within the first 12 months, the value would depreciate from $8,149 to $7,172. For the next year, Williams contended that the value would decline from $7,172 to $3,975. However, Williams was unaware of the amount of the payments that creditor was to receive under the debtors' plan.

This case is not Tammy R. Nobles first bankruptcy case.[2] She filed a prior case in 2002 under chapter 7. Ms. Nobles' post-2002 bankruptcy credit report is not a favorable one. That report reflects that she is in default with respect to most of her debts.

---

[1]The contract interest rate on this note is 22% per annum.

[2]Ms. Nobles' husband did not join her in the 2002 bankruptcy case.

The debtors' plan payments are deducted by one of their employers pursuant to an income withholding order from this court. As of the trial date, the debtors' pay record was 108% according to the trustee. Put another way, since the filing of this case, the debtors have paid in more under their plan than was required. Both debtors are employed. Ms. Nobles works as a receptionist and nets approximately $1,600 per month. Mr. Nobles is a car salesman and nets approximately $1,650 per month. The debtors' plan as proposed runs for a full five-year term.

Legal Conclusions

Pursuant to 11 U.S.C. § 1325(a)(5)(B)(II)(ii), a secured creditor, who will be paid over time under a chapter 13 plan, is entitled to receive the present value of its claim as of the effective date of the plan. In *Till*, the Supreme Court decided upon the method that bankruptcy courts must employ in fixing a rate that will accord a secured creditor the present value of its claim. 541 U.S. at 477, 124 S.Ct. at 1960.

The *Till* Court was a divided one. A four-Justice plurality found that the so-called "formula approach" was the appropriate method to be used in determining the § 1325(a)(5)(B)(II)(ii), cram down interest rate. The formula approach begins with the prime interest rate. The plurality went on to hold that under the formula approach the prime rate should be further supplemented to account for the greater risk of nonpayment that debtors typically pose.[3] *Id.,* 541 U.S. at 478-479, 124 S.Ct. at 1960-1261.

The four-Justice *Till* dissent rejected the formula approach of the plurality opining that such approach would "systematically under-compensate secured creditors for the true risk of default." Instead, the dissent favored the use of the contract interest rate approach. *Id.*, 541 U.S. at 492, 124 S.Ct. at 1968.

The *Till* Court did not specify how the adjustment for risk of nonpayment was to be computed. *Id.*, 541 U.S. at 480, 124 S.Ct. at 1962. The Court, however, offered guidance to that process stating that Section 1325 "obligates the court to select a rate high enough to compensate the creditor for its risk but not so high as to doom the plan." *Id*. The Court further observed that courts generally approved a risk adjustment rate of 1% to 3%. *Id.*; *See also In re Valenti*, 105 F.3d. 55, 64

---

[3]Justice Thomas, while concurring in the judgment, disagreed with the plurality regarding a risk of nonpayment adjustment opining that the plain language of the statute required none. *Id.,* 541 U.S. at 486, 124 S.Ct. at 1965.

(2d Cir. 1997) (noting that the risk premium set by courts range from 1% to 3%). Indeed, a number of courts considering the risk adjustment under the formula approach of *Till* in cases involving automobiles have approved adjustments of 1% to 3%. *See In re Martinez*, 409 B.R. 35, 42 (Bankr.S.D.N.Y. 2009); *In re Grunau*, 355 B.R. 334, 337 (Bankr.M.D.Fla. 2006); *In re Pokrzywinski*, 311 B.R. 846, 850-51 (Bankr.E.D.Wis. 2004); *In re Harken*, 2004 WL 3019467 at *1, 2 (Bankr.N.D.Iowa 2004); *In re Collins*, 167 B.R. 842 (Bankr.E.D.Tex. 1994).

The *Till* plurality lists a number of factors that a bankruptcy court must consider in making the risk adjustment to the prime rate. "[S]uch factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan" are to be considered. *Id.,* U.S. 541 at 479, 124 S.Ct. at 1961. In addition to these factors, Justice Scalia, in his dissent, set out four other relevant factors bearing on the risk premium, some of which overlap those enumerated by the plurality: "(1) the probability of plan failure; (2) the rate of collateral depreciation; (3) the liquidity of the collateral market; and (4) the administrative expenses of enforcement." *Id.,* 541 at 499, 124 S.Ct. at 1973. Further, the *Till* Court instructed that the bankruptcy court must hold a hearing at which "the debtor and any creditors may present evidence about the appropriate risk adjustment ... [T]he evidentiary burden [is] squarely on the creditors ..." *Id.,* 541 U.S. at 479, 124 S.Ct. at 1961.

The evidence is mixed in regard to whether the debtors will succeed in completing their plan. On the one hand, this is not Ms. Nobles' first bankruptcy case. She received a discharge in a chapter 7 case which was commenced in 2002. Further, since receiving a discharge in her prior case, Ms. Nobles' current credit report indicates that she is in default on most of her obligations incurred since the earlier discharge. That evidence, if taken alone, would lead one to conclude that the present case is not likely to succeed.

On the other hand, Ms. Nobles, unlike in the earlier case, has filed the present case jointly with her husband. As of the date of the hearing on this matter, both debtors were working and had paid into the trustee more than was actually due under the proposed plan. In addition, the debtors' employers are subject to an income withholding order which requires the employers to withhold the plan payments from the debtors' income and to remit those funds directly to the chapter 13 trustee. This evidence would lead one to believe that there is a high probability of a successful plan.

The fact that the debtors' plan extends for a full five years adds to the risk of nonpayment. The longer the plan term the greater the window of opportunity that unexpected contingencies will arise that could scuttle the plan.

Concerning the nature of the security, a 2006 Toyota Scion automobile is the security for this creditor's claim. The creditor contends that over the next two years, its collateral will lose more than half of its value due to depreciation. The court is not persuaded by the creditor's evidence regarding depreciation. In particular, the creditor's president testified that in the next year the automobile would depreciate in value from $8,149 to $7,172, which is less than $1,000. However, the next year the creditor contends that the automobile will depreciate almost $3,200 in value from $7,172 to $3,975. This contention flies in the face of what normally occurs with vehicle depreciation, and the creditor did not adequately explain the anomaly.[4] Further, the debtors' plan provides that the creditor will be paid $177 each month throughout the life of the plan. These payments are designed in part to adequately protect the creditor against depreciation of its collateral value during the course of the plan.

Finally, the court must consider the creditor's administrative expenses of enforcement of its claim should the debtors' plan fail.[5] The court received uncontroverted evidence from the creditor's president that its liquidation costs would range between $300 to $1,500.

Upon consideration of these factors, the court finds that the risk of failure of this plan places this case on the high end of the 1%-to-3% range typically allowed by courts rather than on the low end of that range. For these reasons the court finds that the appropriate risk adjustment to the prime rate should be 2.5 %.

Conclusion

For the foregoing reasons an order will enter granting the creditor's motion to reconsider an earlier order confirming the debtors' plan, and the order confirming the

---

[4] Absent a showing of a varying use of a vehicle from one year to the next, one would expect depreciation to be highest in the early years of the useful life of an automobile and decline with each succeeding year of its useful life.

[5] No evidence was presented that would weigh on the state of the liquidity of the collateral markets.

plan will be vacated. Further, an order will enter dismissing the debtors' case prospectively unless within a prescribed time they amend their plan in conformity with this memorandum opinion.

Done this the 16th day of July, 2010.

/s/ Dwight H. Williams, Jr.
United States Bankruptcy Judge

c: Debtors
   Paul D. Esco, Debtors' Attorney
   Burton W. Newsome, Creditor's Attorney
   Curtis C. Reding, Trustee